BILL MATHIS et al. v. STATE.

No. A-9073.   Sept. 25, 1936.
(61 Pac. [2d] 261.)

W. G. Stigler, for plaintiffs in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for the State.

DAVENPORT, J.   The plaintiffs in error, hereafter referred to as the defendants, were charged by information with the crime of open and notorious adultery; the charging part of the information is as follows:

"That Rhodie Hill and Bill Mathis, did, in Latimer County, and in the State of Oklahoma, on or about the 1st day of June, in the year of our Lord One Thousand Nine Hundred and Thirty-five and anterior to the presentment hereof, commit the crime of Adultery in the manner and form as follows, to wit:

"That is to say:   That on the day and date above mentioned and in said county and state, did unlawfully, willfully, voluntarily, and feloniously associate and cohabit together, living in open and notorious adultery, they, the said defendants, not being then and there married to each other, and the said Bill Mathis then and there having a living wife, and the said Rhodie Hill having a living husband, and that the said defendants did unlawfully, voluntarily, and feloniously have carnal knowledge of the body of each other, contrary to the form of the statutes, in such cases made and provided, and against the peace and dignity of the State."

It will be seen from the information that the defendants are charged with open and notorious adultery, and not with the crime of adultery.

The defendants were tried jointly, convicted, and each sentenced to serve two and one-half years in the State Penitentiary. Motion for a new trial was filed, considered by the court, overruled, and exceptions duly saved.

The testimony, in substance, is as follows: Bill Mathis was married and had a living wife; Rhodie Hill was married and had a living husband; the husband of Rhodie Hill had been convicted of a crime and sentenced to the United States Reformatory at El Reno, Okla.; Mathis and Hill had known each other for several years, and when Hill had to go to prison Mathis bought some property from Hill, giving him a note and mortgage on the property to secure payment; Mathis was to make a monthly payment on the note.

The testimony further shows that after Mathis bought Hill's property, Mathis and his family moved to the farm formerly occupied by Hill, in Haskell county. Before Hill went to the penitentiary, Mathis was visiting with Hill and his family, and Hill requested the defendant Mathis to assist in looking after his family and help them along during his absence. It is further shown that at the request of Mrs. Hill's mother, Mathis assisted in moving Mrs. Hill and her two children to the home of John Bunton, in Latimer county, near the town of Red Oak, where Mrs. Hill's mother resided. The defendant Mathis was given credit on his note and mortgage for his charges for moving the Hill family to the Bunton home. At the time the defendant Mathis had made application and was trying to get work at the penitentiary at McAlester as a guard, he made several trips to McAlester about the time the Hill family was moved, and in returning from McAlester the defendant Mathis would often go by the Bunton home where he had left the wife and children of Hill.

The proof shows the Bunton and Hill children did not get along very well together, and Mrs. Hill drove with the defendant to Wilburton to see if she could find a house to rent and to obtain work in the sewing room; she could not find a house, and on her return home a small house belonging to Jones and Hancock was rented; this house was located near the main road and near where the Joneses and Hancock lived. The defendant Mathis assisted building an additional room to the house Mrs. Hill had rented and was at the house some four or five days at that time, while building the room and waiting until the water caused from continued rain subsided.

Later on the mother of Mrs. Hill requested the defendant Mathis to assist in selling some the household goods, and engaged him to move them to Texas; during the time he was engaged in selling the property the defendant Mathis stayed at the house where Mrs. Hill and her mother lived.

Sam B. Jones in substance testifying for the state stated:

"I met the defendants Rhodie Hill and Bill Mathis; they rented a one room old fashioned log house from us in May, 1935, and moved into the house; when they first came we knew him as Mr. Hill, and later we found out his name was Mathis; Mrs. Hill lived in the house a month, lacking two days; they paid one dollar a month for the house; Mr. Hancock and I came to Wilburton one time in Mr. Mathis' car, and he said his wife was going with us; the children were there at the time. I live about 300 yards from the house we rented to them; Mr. Mathis was around the house with Mrs. Hill and her children quite often."

On cross-examination witness stated:

He and Mr. Hancock owned the house together. "Hancock rented the house and I went down to see who had

moved in; the house had been vacant three or four months; the time I went down I saw Mathis, a woman and two children; I was down there probably a half dozen times while they lived there; every time I was there their acts were proper, I did not ask Mr. Mathis his name, nor did I try to find out from him or from the woman where they came from; they had a graphaphone and I went down there to hear some music; when they rented the house it had one room and we built another room about two weeks after they rented it; I hauled the lumber and Mathis helped build the room; I would go down there most any time during the day; I live about 60 yards off the main highway but this house is right by the road side.

"I have been convicted of larceny of some timber and served six months at McAlester. All I know about their moving down there, they told me they was a bunch of the Hills; there were a number of Hill families living in the neighborhood. My information with reference to Mr. Mathis and Mrs. Hill not being husband and wife came through Willie Morris, Foster Muse and Mr. Briggs. When I would be down there I never addressed the defendant either as Mr. Mathis or Hill. I never discussed his name with him."

Frank Guthrie, testifying for the state, in substance stated:

"I am a married man; I know Mr. Mathis and Mrs. Hill; they lived down in my community about two miles and a half east of Cravins, on Willis Hancock's place; I have seen both of the defendants at the house, also the children; they got their mail out of my box; I have seen the defendants traveling together; we got some letters for Mrs. Hill after she moved away; we did not receive any addressed to the defendant Mathis."

Willis Hancock, testifying for the state, stated:

"I am 50 years old; live near Cravins, Oklahoma; I know the defendants Rhodie Hill and Bill Mathis; they lived in a one room log house of mine about a month, I

saw them often; this man told me his name was Hill; they never did tell me anything about being man and wife; the defendants and two children were there about the place; the defendant Rhodie Hill came to my house and milked my cows; the man paid the rent on the house; I went with them to Wilburton one time, Sam Jones was with me.

"I have seen the bill fold exhibited to me but I could not read it; when the defendants were living close to my house Mathis showed me the bill fold; I cannot read the English language; he opened the bill fold to show me the name in the book; he never told me his name; when we rented the house to Mrs. Hill we agreed to put an additional room to it.

"Mr. Mathis never said anything in my presence about he and Mrs. Hill being man and wife; during the times I would be there they conducted themselves properly, like the ordinary persons would; I never saw any improper actions between them at any time; I do speak a little English but not much."

Willis Morris testifying for the state stated:

"I am 36 years old; I live at Salomi; Rhodie Hill is my sister; her husband is now in the Federal prison; I had seen the defendants Bill Mathis and Rhodie Hill riding around in the car, they passed my house several times; they lived for a while about two miles from my house; moved there from Stigler; I was never up to the house where they lived; they told me they lived at the Hancock place; I did not know where they moved to; when they first came they stayed at my mother's; Rhodie stayed there something like two weeks and then pulled out again; I did not know where they went; the children, Gene 11 years old and Marie eight, stayed with my mother. When I would see them in the car sometimes they were alone, and sometimes the children were with them; I do not know whether Bill Mathis' wife was down there where Rhodie Hill and the defendant Mathis lived.

"I had a conversation with Mr. Briggs, in town, about these people living up in the Hancock house but I never did go up there myself; I had trouble with John Bunton's wife and probably my mother and paid a fine; I never had any trouble with Hill or my sister Rhodie Hill; I had seen the defendant at my mother's place; I never saw anything improper between the defendants, the only thing I know is they were living up there on the Hancock place; their conduct when they were in my presence was proper; they unloaded their stuff at my place and moved it the next day; at the time I objected to them unloading it; at this time I did not know the defendant Mathis. Later mother and John Bunton's wife and I had a difficulty over a pressure cooker that belonged to Foster Muse. They wanted to take it away and I would not let them. We had a fight and they both had hold of a claw hammer and I hit at John's wife and hit my mother, I pushed them out of the door; I did not knock my mother down; I have not been around Bunton's place; I don't believe John Bunton ever came voluntary to me and made any complaint. Mrs. Bunton came and talked quite a bit."

W. W. Briggs, the deputy sheriff, stated:

"I know the defendants Rhodie Hill and Bill Mathis. Complaints were made to me about their living together. Bill Morris, Foster Muse and his wife talked to me about the defendants."

On cross-examination witness stated:

"Some parties came several times and wanted me to go over and talk with the defendants, and I advised them I would have nothing to do about it unless some of them swore out a warrant; I never did go over to where they claimed the defendants were living; I went down to the place after the fight between Bill Morris and John Bunton's wife and his mother."

John Tackett, testifying, stated:

"I know the defendants; I don't remember exactly the first one, but John Bunton, and the fellow who lives in

the house past Bunton—Morris—the substance of the testimony was the couple living over there in the Hancock house were not married, and there ought to be something done about it. I never did make an investigation on the conditions there; I never got over there until after they got out the warrant for them; I heard Billy Morris had trouble with his mother."

A number of witnesses who had known the defendant Bill Mathis testified to his previous good character.

John Bunton was called as a witness for the defendant, and stated he lived near the house Rhodie Hill and her children lived in a short distance from Red Oak, in Latimer county, Okla.; that several months prior to the time Rhodie Hill rented the house, Bill Mathis moved Rhodie Hill to his house; the witness' wife and grandmother came with them; the defendant Mrs. Hill stayed with the witness about three or fourth months; Mathis moved Rhodie Hill to the witness' place and stayed that night and left the next morning. Witness stated:

"I never saw the defendants engaged in any secret conference or secret conversation; when the defendant Mathis spent the night at my house he and I slept on a bed on the floor, and once Mrs. Hill's little boy slept on the bed with Mathis; when Mrs. Hill moved away from my house she came over to Wilburton and tried to rent a house but could not do so; the defendant Bill Mathis drove her over to Wilburton; Mathis usually came to my house when he came to that neighborhood; when Mrs. Hill moved back from where she had gone to keep boarders at a saw mill, the defendant Bill Mathis came and was around there for something like a week; me and my family, Mrs. Hill and my wife's grandmother had planned to go to Texas to pick cotton that fall; we employed Mathis to sell a lot of stuff for us, which he did. I never talked to W. W. Briggs or anybody else about the defendants living together."

On cross-examination witness admits he pleaded guilty and paid a fine on a charge of petit larceny; the defendant Bill Mathis came back and forth while the defendant Rhodie Hill was living in the Hancock house near the highway; "during the time the defendants were at the house there, day or night, I saw nothing improper or any act upon the part of either that would indicate any immoral action."

Mrs. W. M. Mathis testified for the defendants and stated:

"I live 10 miles southeast of Stigler; have been living there since the 14th of January, 1935; I know the defendant Mrs. Hill, have known her for about a year, was at her home once; after we moved to where we are now living my husband went to hunt work, and would be gone for a week or two at a time; I would hear from him by mail; my family consists of eight children, my grandchild and stepchild, all at home; during the time Mr. Mathis would be absent he always left sufficient supplies for me and the children; I knew my husband was down there boarding; I went with my husband one time to John Bunton's; were there only a short while, I could not tell you exactly where John Bunton lives, but it is something like six miles from Red Oak; he had a three room house and if I was not turned around it faced the east."

Rhodie Hill, one of the defendants, testified as follows:

"I am the wife of E. L. Hill; I know the defendant Mathis; my husband just before he went to jail sold out to him, and Mathis paid some cash and my husband took a note and mortgage for the rest of the stuff; we moved to Stigler a year ago last April. The amount of the note was $275. When my husband was arrested he was taken to Stigler, and from there to Poteau, and from Poteau to Muskogee; I saw him in Poteau and in Muskogee; when they taken him from Poteau to Muskogee we drove up

'from home to see him and while there I heard my husband tell Mr. Mathis, as you owe me I would like for you to kindly see after these children and my wife; Mr. Mathis moved us over to John Bunton's, and I gave him credit for $10 on the note; I lived at John Bunton's home for a while and then rented the house from Mr. Hancock for $1 per month until the additional room was built; I moved into the house some time in June, the next day after I rented the house; I lived in the little house something like three weeks. Mr. Mathis tried to make Mr. Hancock understand him and took out his bill fold and showed him his name on the bill fold. Mr. Bunton, his wife, and grandmother, hired Mr. Mathis to sell some stuff they wanted to get rid of as they were figuring on going to Texas for the fall cotton picking.

"I went with Mr. Mathis to Stigler one time and left the children with my mother. The credits on the back of the note are the amounts of money Mr. Mathis paid me on the note he owed my husband and the credit for moving us. My brother Bill Morris and I are not on good terms and have not hardly spoken to each other for about six years. When I moved up to the saw mill to keep boarders I knew a number of people up there, including Sam Thresher and his wife, a Mr. Ford, and Dave Hill and his wife; Mrs. Ford is the lady who just left the stand; I could not say positively how many days Mr. Mathis was down there at the place where I was living in the John Bunton neighborhood."

On cross-examination, Mrs. Hill was asked by the county attorney about certain letters, and if they were in the handwriting of her husband, but the letters, if any he had, were not introduced in evidence, and no reason was given why the witness was questioned about the letters.

Other witnesses were called as to the transaction of sales, and purchases made by the witness Mathis, and from Mathis to the witnesses.

The defendant W. N. Mathis testified in his own behalf and stated:

"I live about nine and one-half miles southeast of Stigler, and then detailed his dealings with Mr. E. L. Hill, and the purchasing of some property, and the executing of a note and mortgage to Hill, and introduced the note and mortgage in evidence. At the request of Mr. Hill I drove his wife and children in my car to Poteau to see Mr. Hill; he asked me to pay as much as $15 a month on the note, if I would it would help his family along.

"I fixed up a trailer and moved Mrs. Hill and her children and her property down to the John Bunton's home in the neighborhood mentioned here in this trial; I told them when I rented the little house that Mrs. Hill and her children would live there, and that my name was Mathis; finally I took my bill fold out and showed it to the man in order to try and make him understand who I was. John Bunton and I helped Mrs. Hill move into the house the next day after we rented it, and I stayed around four or five days and helped put up a room; it had a roof on it but did not have any weather boarding. Sam B. Jones and myself worked on the room; during the time I was there Mr. Jones and Mr. Hancock both came down to the house, once they came together and other times they would be separate, one at a time; I drove Mrs. Hill to Wilburton on one occasion to get groceries, accompanied by the children; the next time she came with Mr. Jones, Mr. Hancock and myself. It was about the first or second week in June."

Each of the defendants denied they had lived as man and wife, or in open and notorious adultery.

The foregoing is the substance of the testimony introduced by the defendants. In rebuttal the state called Lum Gillispie, who said he was the mail carrier and passed back and forth by the house Mrs. Hill and the children lived in and had seen the defendant's automobile there

often. Then Margie Nation was called, who testified to having taken a statement of some witnesses, the statement attempting to show the connection and relation between the defendants. At the close of the testimony the defendants "moved the court to instruct the jury to return a verdict of not guilty on behalf of the defendants, for the reason that all of the evidence on behalf of the state does not prove the crime charged in the information, or any crime against the statutes of Oklahoma." Which motion was denied and exceptions duly saved.

The defendants have assigned eleven errors alleged to have been committed by the court in the trial of their case. The defendants, in presenting their argument have ably and at length set forth their views as to the law, and have drawn a distinction between adultery and open and notorious adultery. The first assignment discussed by the defendants is:

"The court erred in failing to sustain the objection of the defendants to the introduction of any evidence, and of any evidence other than in support of the allegation in the information of open and notoriously living together and for the reason that the information failed to charge an offense cognizant to the laws of Oklahoma and that the said information is duplicitous in that it seeks and does charge two separate offenses."

The defendants say that in their opinion the information is duplicitous and charges two separate offenses, one of the offenses of ordinary adultery, and the other of open and notorious adultery.

Section 1837, O. S. 1931, defines "adultery" as follows:

"Adultery is the unlawful voluntary sexual intercourse of a married person with one of the opposite sex; and when the crime is between persons, only one of whom

is married, both are guilty of adultery. Prosecution for adultery can be commenced and carried on against either of the parties to the crime only by his or her own husband or wife as the case may be, or by the husband or wife of the other party to the crime; Provided, that any persons may make complaint when persons are living together in open and notorious adultery."

This section of the statute has been passed upon by this court many times, and the court has repeatedly held that a prosecution for adultery other than open and notorious adultery cannot be carried on unless the injured spouse starts the prosecution. Lee v. State, 28 Okla. Cr. 397, 398, 231 Pac. 324; Copeland v. State, 10 Okla. Cr. 1, 133 Pac. 258; Shoemaker v. State, 12 Okla. Cr. 313, 155 Pac. 701.

The theory of the state in presenting its testimony is that the defendants were guilty of open and notorious adultery, and that the prosecution could be carried on without the spouse of either of the defendants starting the prosecution. It is clear from the record in this case that it was not intended by the state to prosecute the defendants for adultery, but the state tried them on the theory that they were living in open and notorious adultery, and secured a conviction.

The question, then, for this court to decide is: Is there sufficient evidence in the record to sustain a conviction for open and notorious adultery? This question is not a new one before this court, and has been passed on by the court many times. The state in its brief insists the testimony is sufficient to sustain a conviction of open and notorious adultery. The witness W. W. Briggs testified two or three parties spoke to him about the way the defendants were living; that he knew nothing about the facts. Neither of the parties named by the

witness Briggs were called as a witness in the case. If they had complained, they, and they alone, would be the ones who could furnish testimony for the state as to the conduct of the defendants. The statements of the different parties to Briggs were nothing more than hearsay.

The state relies upon the case of Kitchens v. State, 10 Okla. Cr. 603, 140 Pac. 619, to sustain its position that the evidence is sufficient to sustain a judgment of conviction of the defendants for open and notorious adultery. If the facts in this case were the same or similar to the Kitchens Case, supra, then the contention of the state might be tenable, and the state would have some justification for arguing the testimony is sufficient to sustain a conviction.

In the Kitchens Case a number of parties testified that they had spoken to the defendant about the way he and Mollie Mitchell were living; that Kitchens brought Mrs. Mitchell to a writing school one evening and the ladies present rebuked her, and the defendant did not come any more. A witness testified he had seen the defendant and Mollie Mitchell in the home alone, saw the defendant with his arms around her, saw her sitting on his lap; one evening saw Mrs. Mitchell with her arms around the defendant's shoulders, and Kitchens was holding her clothes up exposing her person from her waist down. Several witnesses testified to having seen the defendant Kitchens and Mollie Mitchell in a compromising position, loving each other, and acting very improper and indecently.

In this case no such testimony has been introduced, not a witness testified to any improper relation between the defendant Mathis and defendant Hill. The only evidence introduced by the state is evidence showing the

defendants had been seen at different times at the house where it is admitted the defendant Hill and her children resided. Not one word is in the record, showing, or tending to show, that any one had ever seen the defendants in a compromising position or attitude, or acting one toward the other in a way that would indicate they were living together or cohabiting as man and wife.

If the conviction in this case is sustained, it will be necessary that this court hold the fact that these defendants had been together at different places, and the defendant Mathis helped move Mrs. Hill to the house she rented from Mr. Hancock, and was there two or three days helping build a room to the house, and was going back and forth a time or two after that during the time Mrs. Hill was living in the house.

In Copeland v. State, 10 Okla. Cr. 1, 133 Pac. 258, this court defined "living in open and notorious adultery" as follows:

"To constitute living together in open and notorious adultery the parties must reside together publicly, in the face of society, as if the conjugal relations existed between them, and their illicit intercouse must be habitual."

In Barber et al. v. State, 15 Okla. Cr. 588, 179 Pac. 790, this court in the first paragraph of the syllabus said:

"To constitute 'living in open and notorious adultery,' under the statute, there must be something more than occasional illicit intercourse indulged in; the parties must reside together publicly in the face of society, as if conjugal relations existed between them, and their so living must become generally known in the community in which they live."

In Gill v. State, 32 Okla. Cr. 278, 240 Pac. 1073, 1075, in the body of the opinion the court states: The word "notorious" comes from the Latin word meaning

"to know", and it is defined in Webster, as generally known and talked of; well or widely known; forming a part of common knowledge; universally recognized. Further in the opinion the court stated:

"In order to prove the offense of open and notorious adultery so that a prosecution may be commenced and carried on by a person other than a spouse of one of the offending parties, there must be some evidence that it was known in the community that the claimed relation of husband and wife was false. When there is no such evidence, the proof does not show notoriety. There is a defect of proof of a notorious adultery between the parties, and it follows that no one but the wife of the defendant could commence and carry on the prosecution."

Briefly, in Gill v. State, supra, the facts show that defendant was a married man employed as a brakeman for a railway company; was acquainted with Florence Darlymple, an unmarried woman working at Vici, where she was employed in the household of N. T. Eckhart; on three different occasions the defendants came to the premises of Eckhart when F. Darlymple introduced him to Eckhart and his wife as her husband, and on each occasion they occupied the same room in which there was one bed. The record discloses no one among the neighbors prior to the arrest of the defendant knew that Florence Darlymple was not married, or that their relation was adulterous.

The defendants have assigned other errors, but the view we take of this record, it is not necesary to extend this opinion to any greater length. The prosecution from its inception to the rendition of the judgments is for living in open and notorious adultery. This court is bound by the record before it to apply the law to the facts in the case, and the conclusion is reached that the evidence wholly fails to support a conviction for living together

in open and notorious adultery within the meaning of our statutes as construed in the cases herein cited.

For the reason that the judgments are not supported by evidence sufficient to establish the material ingredients of living together in open and notorious adultery, the same are reversed, and the case remanded for further proceedings consistent with this opinion.

EDWARDS, P. J., and DOYLE, J., concur.